**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

St. Jude Medical S.C., Inc.,

                                  Plaintiff,

v.

Neal J. Hanson and Biotronik, Inc.,

                                  Defendants.

Civ. No. 13-2463 (RHK/BRT)
**MEMORANDUM OPINION
AND ORDER**

Edward F. Fox, Jessica L. Klander, Jonathan C. Marquet, Kevin P. Hickey, Bassford Remele, PA, Minneapolis, Minnesota, for Plaintiff.

Andrew J. Pieper, Eric A. Bartsch, Margaret E. Dalton, Stoel Rives LLP, Minneapolis, Minnesota, Todd A. Hanchett, Stoel Rives LLP, Portland, Oregon, for Defendants.

**INTRODUCTION**

Plaintiff St. Jude Medical S.C., Inc. ("SJM") alleges in this action that its former employee, Defendant Neal Hanson, breached his contract and duty of loyalty. SJM also alleges that Defendant Biotronik, Inc. ("Biotronik") tortiously interfered with SJM's contract with Hanson. SJM also claims it is entitled to the imposition of a constructive trust as a result of Hanson's and Biotronik's actions. Defendants now move for summary judgment, which, for the reasons explained below, will be granted in part and denied in part.

**BACKGROUND**

The following facts are recited in the light most favorable to SJM.

Hanson began working for SJM, a medical-device company, in Kansas City in 2009. (Klander Decl., Ex. 1, 61.) Through his work he became friends with Dr. Yarlagadda, a doctor working at Olathe Medical Center ("OMC") who did substantial business with SJM's Cardiac Rhythm Management (CRM) devices. (Id., Ex. 1, 66; id., Ex. 5, 34, 76-77.) Hanson moved to Wichita, Kansas, for a new position with SJM in 2011. (Id., Ex. 4, 30.)

The following year, a competing medical-device company, Medtronic, offered Hanson a job back in Kansas City. (Id., Ex. 1, 118.) Hanson accepted the offer and informed his boss, Gray Fleming, that he would be resigning from SJM. (Id., Ex. 1, 119.) After unsuccessfully trying to convince Hanson to stay in Wichita, Fleming offered him a position with SJM in Kansas City in an attempt to keep him at SJM. (Id., Ex. 4, 53-54.) Hanson accepted that offer. (Id., Ex. 4, 55-56.)

Hanson signed a contract with SJM on October 29, 2012, titled "Amendment No. 2 to Employment Agreement" ("Amendment 2"). (Dalton Decl., Ex. 13.) The contract provided for a three-year term, running until October 27, 2015. (Id., Ex. 13, 1.) It further provided that "[i]n order to perform the duties hereunder, [Hanson] agrees to relocate to the Kansas City area within ninety (90) days of the effective date of this Amendment. As consideration for entering into this Amendment, [SJM] will assist with the costs of [Hanson's] relocation . . . ." (Id., Ex. 13, 2.)

Fleming and Hanson never explicitly discussed the timeline for Hanson's transition from Wichita to Kansas City, although Fleming estimated it would take 6-8 months. (Klander Decl., Ex. 4, 72-73.) Hanson (and his wife) bought a house in Kansas

City (more quickly than expected)—they moved to Kansas City in December 2012, receiving $42,007.82 in relocation expenses from SJM (id., Exs. 11, 64)—but Hanson reassured Fleming that he "still plann[ed] on a slow transition here in Wichita . . . I have no intention to see the hard work WE have put in here just disappear" (id., Ex. 64) (capitalized in original). Fleming testified it was clear that Hanson thought it was important to "responsibly and appropriately transition the business in Wichita" and he would be "accountable to the business." (Id., Ex. 4, 64, 73.)

On January 1, 2013, Fleming changed positions at SJM (id., Ex. 4, 93) and was replaced by Butch Peltz (id., Ex. 3, 57). Peltz and Hanson talked sometime between mid-January and mid-February about Hanson's move to Kansas City. (Id., Ex. 3, 89.) Peltz reassured Hanson he would eventually work in Kansas City, but asked him to continue helping in Wichita until SJM hired his replacement, to which Hanson "was very agreeable." (Id., Ex. 3, 90.) But after searching for a replacement for Hanson in Wichita, Peltz decided he wanted to keep Hanson in the role. (Id., Ex. 3, 73-78, 86.) In late February, Peltz asked Hanson if he was interested in the Wichita position, and Hanson said he was.[1] (Id., Ex. 3, 110, 114, 124.) The two had ongoing discussions about Hanson's future with SJM in Wichita between late February and March.[2] (Id., Ex. 3, 176.)

---

[1] Hanson characterizes his conversations with Peltz differently, explaining he asked to be included in conversations Peltz had with others about him staying in Wichita, but expressed his preference for being "in Kansas City with [his] family." (Dalton Decl., Ex. 7, 211.)

[2] Hanson denies he negotiated for a position in Wichita. (Dalton Decl., Ex. 7, 212.)

During this time, Hanson received a call from Bob Koop, an independent representative for Defendant Biotronik, another medical device company. (Id., Ex. 2, 27.) Koop contacted Hanson to recruit him to work at Biotronik in Kansas City. (Id., Ex. 2, 31.) The two met for dinner on January 28, 2013, in Wichita. (Klander Decl., Ex. 2, 37, 42-43.) The next day, Koop emailed Hanson to thank him for meeting and to encourage him to "take the next step and call Dr. Yarlagadda." (Id., Ex. 13.) Over the next month, Hanson sent Koop his SJM employment documents, including a copy of his original contract to work with SJM in Wichita (id., Ex. 20) and a copy of Amendment 2 (id., Ex. 18). On March 5, Koop filled out a Biotronik Hiring Justification Form for Hanson, listing OMC as a potential account. (Id., Ex. 55.) But the next week, Ramon Carrasquillo, Biotronik's Director of Field Organization, told Hanson that Biotronik could not hire him because of his employment agreement with SJM. (Dalton Decl., Ex. 27, 131-32.) Hanson subsequently informed Koop, on March 15, 2013, that his lawyer was reviewing his employment contract with SJM. (Klander Decl., Ex. 34.)

By April 2013, Hanson was waiting for a new contract from SJM and texting Koop about the wait.[3] (Id., Ex. 24.) On April 23, Peltz sent him an employment agreement for the Wichita position. (Id., Ex. 38.) Hanson texted Koop that day informing him of SJM's offer. (Id., Ex. 38.) Soon after, on April 25 and 26, Koop asked Carrasquillo if Biotronik could make an offer to Hanson (id., Ex. 24), but Carrasquillo said to wait until SJM clearly accepted Hanson's resignation so that Biotronik was not

---

[3] Hanson testified that in April he was still hoping to get a contract from SJM that would move him to Kansas City. (Dalton Decl., Ex. 7, 248.)

"tortiously interfering" with Hanson's contract with SJM (id., Ex. 24).  Hanson's attorney drafted a resignation letter (id., Ex. 1, 331), which Hanson sent to SJM on April 26, 2013 (id., Ex. 1, 333).

SJM did not accept Hanson's resignation in April, but did send him a letter on May 31, 2013, accepting that he had unequivocally repudiated his contract with SJM. (Id., Exs. 42, 45.)  Two weeks later, on June 14, Biotronik sent Hanson an employment agreement to work in Kansas City, and Hanson began working there on July 8, 2013. (Dalton Decl., Ex. 27, 91; Id., Ex. 33.)

SJM filed this action on August 19, 2013, asserting four claims: 1) breach of contract, against Hanson; 2) breach of fiduciary duty of loyalty, against Hanson; 3) tortious interference with contract, against Biotronik; and 4) constructive trust and accounting, against Hanson and Biotronik.  Defendants now move for summary judgment.  The Motion has been fully briefed and is ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving parties are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  The moving parties bear the burden of showing that the material facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d

885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

### ANALYSIS

*1. Breach of Contract*

SJM's first claim is that Hanson breached his employment contract. Hanson responds that he was excused from performance when *SJM* materially breached by not employing him in Kansas City within 90 days of that contract being signed, that is, by January 27, 2013.

The Court agrees with Hanson that SJM breached Amendment 2 by not transferring Hanson to a job in Kansas City by January 27, 2013. The Court has previously interpreted the contract to require such a move (see Doc. No. 62) and continues to believe that is the correct interpretation. Amendment 2 describes Hanson's new title and salary and then provides that "[i]n order to perform the duties hereunder, Employee agrees to relocate to the Kansas City area within ninety (90) days of the effective date of this Amendment." (Dalton Decl., Ex. 13.) The phrase "in order to perform the duties hereunder" immediately precedes the discussion of Hanson moving to Kansas City within 90 days, directly connecting Hanson's move—and its time frame—to his new job title. As a matter of common sense, a move to Kansas City in order to perform his new job duties implies he will do his new job *there*, within the time frame he

is given to move.  It would be unreasonable to interpret the contract otherwise.  And it is undisputed that SJM did not employ Hanson in Kansas City by January 27, 2013.

The court agrees with SJM, however, that there is a material dispute of fact about whether this breach was material.  Only a material breach would release Hanson from his contractual obligations to work for SJM.  E.g., Heyn v. Braun, 59 N.W.2d 326, 330 (Minn. 1953).[4]  A breach is material when it goes to "the root or essence of the contract." BOB Acres, LLC v. Schumacher Farms, LLC, 797 N.W.2d 723, 728 (Minn. Ct. App. 2011) (internal citations and quotations omitted).  Whether a breach is material is typically a question of fact for a jury, Sitek v. Striker, 764 N.W.2d 585, 593 (Minn. Ct. App. 2009), although courts have held a breach material as a matter of law when the facts led to no other conclusion, Farmers Ins. Exch. v. West, Civ. No. 11-2297, 2013 WL 1687704, at *4 (D. Minn. Apr. 18, 2013) (Magnuson, J.); see also Valspar Refinish, Inc. v. Gaylord's, Inc., No. A06-2227, 2007 WL 4237504, at *3 (Minn. Ct. App. Dec. 4, 2007).

Hanson contends SJM's breach was material as a matter of law.  According to him, he intended to resign from SJM in October 2012 to work for Medtronic in Kansas City (Dalton Decl. Ex. 7, 128-29) and turned down that job only when SJM offered him a position in Kansas City (id., Ex. 3, 53-54; id. Ex. 12).  The entire point of Amendment 2, in his view, was to work in Kansas City.  But SJM points to facts disputing that the *timing* of Hanson's move to Kansas City was essential to the contract.  Even after Hanson

---

[4] Hanson's employment agreement contains a Minnesota choice-of-law provision.  (See Doc. No. 62, n.2.)

bought a house in Kansas City, he assured Fleming that he "still plan[ned] on a slow transition here in Wichita . . . I have no intention to see the hard work WE have put in here just disappear." (Klander Decl., Ex. 64.) To Fleming, it was clear that Hanson expected to "responsibly and appropriately transition the business in Wichita" to someone else (id., Ex. 4, 64), and Hanson agreed that he would be accountable to the business (id., Ex. 4, 73). Once Peltz took over in Wichita in January 2013, Hanson continued to be "very agreeable" to helping transition the Wichita business until SJM hired his replacement. (Id., Ex. 3, 90.) In the Court's view, a reasonable jury could find from these facts that the requirement to move Hanson to Kansas City within *90 days* was not of the essence of the contract. There is a genuine issue whether SJM's breach was material and, therefore, whether Hanson was excused from performance after January 27, 2013. The Court cannot determine, as a matter of law, that Hanson did not breach Amendment 2 when he left SJM before October 2015 and will deny summary judgment on Count I.

*2. Duty of Loyalty*

SJM also alleges Hanson breached his fiduciary duty of loyalty. At the outset, Hanson argues there is no such thing as a "fiduciary duty of loyalty" in Minnesota, identifying two distinct claims: (1) fiduciary duty and (2) duty of loyalty. But it is apparent to the Court that SJM is arguing about the duty of loyalty. SJM describes the duty as requiring an employee "to act in the interests of the employer and not as an adversary" (Pl. Opp'n Mem., 29), which is nearly identical to the principle under

Minnesota's duty of loyalty that an employee cannot "feather his own nest at the expense of his employer." Sanitary Farm Dairies, Inc. v. Wolf, 112 N.W.2d 42, 48 (Minn. 1961).

The duty of loyalty under Minnesota law prohibits an employee "from soliciting the employer's customers for [himself], or from otherwise competing with [his] employer, while [he] is employed." Rehab. Specialists, Inc. v. Koering, 404 N.W.2d 301, 304 (Minn. Ct. App. 1987); see also Eaton Corp. v. Giere, 971 F.2d 136, 141 (8th Cir. 1992); Sanitary Farm Dairies, 112 N.W.2d at 48. An employee may *prepare* to compete with his employer while he is still employed, however, so long as he does not *actually* solicit or otherwise compete with his employer. Rehab. Specialists, Inc., 404 N.W.2d at 305; see also Signergy Sign Group, Inc. v. Adams, Nos. A04-70, A04-147, 2004 WL 2711312, at *1 (Minn. Ct. App. Nov. 30, 2004) ("What is required is a balancing of the employer's legitimate interest in having its business advanced by an employee, and the employee's legitimate interest in bettering him or herself in a new business and providing for his or her continuing livelihood."). Whether a person has breached his duty of loyalty—that is, whether he has crossed the line from preparing to compete into soliciting competition or otherwise competing—is a question of fact to be determined based on all the circumstances of the case. Rehab. Specialists, Inc., 404 N.W.2d at 305.

SJM identifies facts from which a reasonable jury could infer that Hanson crossed the line by contacting Dr. Yarlagadda—a key decision-maker at OMC regarding the use and purchase of medical devices (see Klander Decl., Ex. 5, 34, 75-76)—for Biotronik's benefit while still working at SJM. Koop told Hanson on January 29, 2013, that he "hope[d] [he] will take the next step and call Dr. Yarlagadda" (id., Ex. 13). Hanson then

9

visited with Dr. Yarlagadda in March 2013. (Id., Ex. 1, 290.) And Biotronik's sales at OMC jumped from $4,200 in the period between August 2011 and April 2012, to $94,000 in the period between May 2012 and April 2013. (Id., Ex. 9.) Hanson argues that he and Dr. Yarlagadda are personal friends (id., Ex. 1, 66), and that SJM does not point to direct evidence that he solicited Dr. Yarlagadda's business for Biotronik. While the Court believes the facts identified by SJM are not overwhelming, it nevertheless concludes that a reasonable jury could infer from them that Hanson was working to solicit business for Biotronik's benefit while he was working at SJM.[5] The Court cannot conclude as a matter of law that Hanson did not violate a duty of loyalty and will deny summary judgment on Count II.

*3. Tortious Interference*

SJM's third claim is against Biotronik for tortious interference. A claim of tortious interference has five elements: "1) the existence of a contract; 2) the alleged wrongdoer's knowledge of the contract; 3) intentional procurement of its breach; 4) without justification; and 5) damages." Kallok v. Medtronic, Inc., 573 N.W.2d 356, 362 (Minn. 1998). At issue here is the third element, intentional procurement of a breach. Minnesota courts finding an intentional procurement describe a recruitment process that includes a job offer to an employee while he still works for the former

---

[5] The Court declines to dismiss this claim on the grounds that it and the breach-of-contract claim request the same recovery. While double recovery is prohibited under Minnesota law, see Wirig v. Kinney Shoe Corp., 461 N.W.2d 374, 379 (Minn. 1990), Federal Rule of Civil Procedure 8(d)(2) allows for alternative pleading, see also id. (explaining that under Minnesota substantive law, "[m]uch like a products liability case where plaintiff pursues both a warranty and a negligence action, here plaintiff may pursue either or both sexual harassment and battery, provided, however, there is no double recovery"), and at this stage the Court cannot predict whether a jury will find Defendants liable on both counts.

employer. For example, in Kallok, company officials "met with [the employee] on numerous occasions and procured the breach of his noncompete agreements by offering him the vice president position that he eventually accepted." Id.; see also St. Jude Medical, S.C., Inc. v. Biosense Webster, Inc., 994 F. Supp. 2d 1033, 1049 (D. Minn. 2014) (Montgomery, J.) (finding intentional procurement when the new employer regularly attempted to communicate with the employee, described its efforts with the potential employee as "progressing," met in person, offered a position as territory manager with a signing bonus, and promised a full defense against breach of contract); St. Jude Medical S.C., Inc. v. Biosense Webster, Inc., No. A13-0414, 2013 WL 5508389, at *3 (Minn. Ct. App. Oct. 7, 2013) (finding intentional procurement when the new employer contacted the employee and offered her a job before she quit her job with her old employer, then created a position to which she applied after quitting).

    Here, SJM offers only one cursory sentence on the issue of intentional procurement, claiming it is clear Biotronik tortiously interfered with the contract and referring to earlier parts of its brief detailing the regular contact between Koop and Hanson in the first few months of 2013. SJM does not point to any facts in the record, however, indicating that Biotronik made an actual job offer to Hanson or guaranteed hiring him or paying him a particular salary. Rather, the record shows that Biotronik was careful *not* to make an offer to Hanson or commit Biotronik to hiring him. When Koop wanted to make an offer to Hanson—admittedly going so far as filling out a Hiring Justification Form on March 5, 2013 (Klander Decl., Ex. 55)—Carrasquillo refused, because Hanson had a term-of-years employment agreement with SJM. (Dalton Decl.,

Ex. 27, 131-32.) Carrasquillo even called Hanson on March 11 to explain that Biotronik would *not* hire him because of that agreement. (Id., Ex. 27, 131-32.) Carrasquillo also refused to make an offer to Hanson *after* he resigned from SJM, to ensure SJM accepted the resignation and Biotronik would not be "tortiously interfering" with the SJM contract. (Id., Ex. 24.) Unlike cases where courts have found intentional procurement of a breach, the record here establishes that Biotronik did not make a job offer to Hanson, and in fact worked hard to *avoid* giving Hanson the impression that he was leaving SJM *for* a job at Biotronik. As SJM cannot point to facts satisfying the third element of the claim of tortious interference with contract, the Court will grant summary judgment on Count III.

*4. Constructive Trust*

Finally, SJM brings a claim for constructive trust.[6] But a constructive trust is a remedy, not a claim. Wright v. Wright, 311 N.W.2d 484, 485 (Minn. 1981) ("[A] constructive trust is a judicially created equitable remedy. . . ."); ACCAP-HUD Homes Tax Credit Ltd. P'ship v. Minn. Cntys. Intergovernmental Trust, No. A12-0864, 2012 WL 5834560, at *6 n.2 (Minn. Ct. App. Nov. 19, 2012) ("Constructive trusts and equitable liens are remedies, not causes of action themselves."). In fact, SJM also asks for a constructive trust in its prayer for relief. (Compl., 10.) As such, SJM cannot succeed on a "claim" for constructive trust.

Defendants suggest this claim may really be one for unjust enrichment. Even if the Court construed it as such, however, it would fail. In Minnesota, unjust enrichment

---

[6] Count IV of SJM's Complaint is titled "Constructive Trust and Accounting," but no party discusses accounting in its brief.

claims are limited to those "premised on an implied or quasi-contract between the claimant and the party alleged to be unjustly enriched" and "[do] not apply when there is an enforceable contract that is applicable." Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 838 (Minn. 2012). In its brief, SJM makes no argument about and points to no facts in the record from which the Court could infer an implied or quasi-contract between SJM and Hanson. Rather, it disputes the justness of Hanson's and Biotronik's behavior regarding Hanson's breach (in its view) of the *written* contract between Hanson and SJM. Accordingly, the Court will grant summary judgment on Count IV.

   *5. Damages*

In addition to moving for summary judgment, Defendants argue that the damages SJM seeks for lost revenue at OMC are not recoverable because they are speculative. Specifically, they argue that SJM fails to consider alternative explanations for lost revenue and that the losses were not causally connected to Hanson's employment at Biotronik. Courts will not award damages under Minnesota law which are "remote and speculative." Jackson v. Reiling, 249 N.W.2d 896, 897 (1977). To receive damages for lost profits, SJM's losses must be a "natural and probable consequence of the breach," Fung v. Riemenschneider, No. C6-02-917, 2003 WL 21005539, at *3 (Minn. Ct. App. May 6, 2003), but the proof does not require "absolute certainty," Tri State Grease & Tallow Co. v. BJB, LLC, No. A10-1560, 2011 WL 2518954, at *3 (Minn. Ct. App. June 27, 2011).

Here, SJM points to evidence comparing Biotronik's and SJM's revenue at OMC. From the period spanning May 2012-April 2013, to the period spanning May 2013-April 2014, Biotronik's sales at OMC increased $632,300 (Klander Decl., Ex. 9), while SJM's sales at OMC decreased $550,463 (id., Ex. 60). This shift roughly aligns with Hanson's move from SJM to Biotronik. This is sufficient evidence, in the Court's view, from which a reasonable jury could conclude, without speculating, that SJM suffered damages because of Hanson's move to Biotronik. At trial, Defendants may present evidence of the numerous factors other than Hanson's move to Biotronik that they believe contributed to these revenue numbers. See Holiday Hosp. Franchising, Inc. v. H-5, Inc., 165 F. Supp. 2d 937, 940 (D. Minn. 2001) (explaining that arguments about the failure to consider certain relevant factors in calculating damages "merely raise questions of fact (albeit serious ones) which are more appropriate for cross-examination at trial"). The Court declines to say, at this juncture, that damages are not recoverable.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 88) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Motion is **GRANTED** as to Counts III and IV, and those Counts are **DISMISSED WITH PREJUDICE**; it is **DENIED** in all other respects.

Date:  May 6, 2015                                    s/Richard H. Kyle
                                                     RICHARD H. KYLE
                                                     United States District Judge